IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY COUNCIL, #210870, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:07-cv-331-MEF |
| | ) |
| DAVE SUTTON, *et al.*, | ) (WO) |
| | ) |
| | ) |
| Defendants. | ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Timothy Council ("Council" or "Plaintiff"), pursuant to 42 U.S.C. § 1983, challenges the constitutionality of actions taken against him while confined in the Coffee County Jail. The defendants' motion for summary judgment was granted in part and denied in part. (Doc. #33). Prior to trial, Council clarified that he was only seeking monetary damages against the remaining defendants—Jeffery Shelton ("Shelton"), Neal Bradley ("Bradley), and Alston Redman ("Redman")—in their individual capacities. Council alleges that Shelton and Bradley subjected him to excessive force in violation of the Eighth Amendment, and Redman witnessed this excessive force and failed to intervene. After Plaintiff rested his case, defense counsel moved for judgment as a matter of law. The Court granted this motion only as to the claims against Redman, finding that Council failed to present any evidence supporting his claim of failure to intervene against Redman. Therefore, at the close of trial, Council's remaining claims were for excessive force against Shelton and Bradley (collectively,

"Defendants").

After weighing the evidence and testimony offered by the parties during a bench trial, the Court finds that judgment is due to be entered in favor of Defendants and against Plaintiff. In support of this judgment, the Court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

Having listened carefully to the testimony from the witness stand while viewing the demeanor of the witnesses and having considered the documentary exhibits admitted into evidence, the Court finds that the credible evidence established the following facts relevant to the issues raised by the remaining claims in this lawsuit:

1. In late February, 2007, a search was conducted of cellblock 2 in Coffee County Jail. The inmates referred to this cellblock as the "Thunderdome," as it had a reputation for danger, fights, and contraband. Bradley and Shelton, both members of the Coffee County Sheriff's Office, were involved in this search of cellblock 2. Officials found several pieces of contraband during the search, including at least one weapon. Bradley, Shelton, and Council were all aware that a weapon had been found during the search. That weapon was not recovered from Council or his belongings.

2. On March 1, 2007, a tornado struck Coffee County, Alabama.

3. On the night of March 3, 2007, officials at Coffee County Jail issued a call on police radios that inmates were rioting in cellblock 2.

4. Bradley, aiding in the ongoing recovery efforts from the tornado, was on supper

break when he heard the call about the riot, and he immediately headed towards Coffee County Jail.

5.  Shelton also heard the call while aiding in recovery efforts from the tornado and headed towards Coffee County Jail.

6.  Shelton and Bradley met two other deputies, Hines and Redman, in the parking lot of Coffee County Jail (collectively, the "deputies").

7.  The deputies prepared to enter the jail to control the riot in cellblock 2.  Bradley put on his tactical vest, which included a taser.  Shelton wore a shotgun loaded with non-lethal beanbag rounds, with its strap going around his back and the barrel facing towards the ground ("safety down position").

8.  At this time, Bradley was trained and certified in taser use, and Shelton was trained and certified in the use of non-lethal beanbag shotgun rounds.

9.  The deputies entered Coffee County Jail and headed towards cellblock 2.

10.  Before entering cellblock 2, the deputies were met by Deputy Candida Stokes ("Deputy Stokes") as she escorted inmate Marcus Snell ("Snell") from cellblock 2 to intake for processing.  Deputy Stokes was taking Snell into custody for refusing to follow orders and confronting her as she tried to get the inmates in cellblock 2 to return to their cells.  She informed the deputies that an inmate in cell 17 had thrown a liquid, thought to be urine, on her as she was removing Snell from cellblock 2.

11.  The section of Coffee County Jail that includes cellblock 2 is arranged in a circular layout.  There is a central command post ("central command") in the center of the

circle. Cells are placed along the inside perimeter of the circle. Cellblock 2 takes up approximately one-quarter of this section of Coffee County Jail. It consists of eighteen cells on two floors: cells 1 through 9 on the first floor and cells 10 through 18 on the second floor, with a catwalk outside the second-floor cells. Between the cells and central command, there is a two-story "day room" for the inmates in cellblock 2 when they are out of their cells.

12. The deputies entered the door for cellblock 2 into the day room and gave orders for the inmates to return to their cells. The riot was ongoing, and several inmates were still outside of their cells.

13. Two corrections officers were already in cellblock 2, also attempting to restore order and return the inmates to their cells.

14. Corrections officer Jack Carradine told the deputies that it was inmate Alex Pyatt ("Pyatt") in cell 17 who had thrown the liquid on Deputy Stokes.

15. The deputies went up the stairwell to the catwalk of cellblock 2 to remove Pyatt from cell 17 and take him into custody.

16. Pyatt and Council were the inmates in cell 17. Bradley and Shelton did not know Pyatt or Council or know what either Pyatt or Council looked like.

17. From the perspective of the catwalk, cell 17 had the following layout: A single bunk was positioned along the left wall. A double bunk—one bed stacked on top of another—was against the back wall. On the right side of the cell, a rope was strung from the back wall, adjacent to the foot of the double-bunk, to the door of the cell. The sink and toilet for cell 17 were located to the right of the rope. Pieces of cloth were hung over the rope—a

"curtain" of sorts—blocking the right side of the cell from the view of the rest of the cell.

18. Pyatt heard the deputies coming and laid down on the floor of cell 17. Council was positioned to the right of the rope, though he had room in the cell to lie down next to Pyatt. From this position, the "curtain" at least partially concealed Council from the rest of the cell and from anybody standing outside of the cell.

19. The deputies arrived at the door to cell 17, ordered Pyatt and Council to get down on the floor, and asked for the person in central command to open the door. While the door was opening, the deputies continued to order Pyatt and Council to get down.

20. Once the door to cell 17 opened, the deputies entered the cell. Bradley entered first, followed by Shelton. Bradley had his taser out, while Shelton kept his shotgun in safety down position.

21. Bradley and Shelton approached Council, still ordering him to get down, while the other two deputies handcuffed Pyatt and removed him from the cell.

22. Council remained standing and/or crouched behind the "curtain" in the cell with his hands up, cursing at the deputies.

23. Council began moving forward, lowering his hands. At this point, Bradley pulled down the "curtain" and fired a cartridge from his taser at Council.

24. The cartridge consisted of two probes connected by wires back to the part of the taser in Bradley's hand. One probe connected to the back of Council's left hand while the second connected to his torso.

25. The effect of the taser initially caused Council to drop to the ground.

26. One shot of the taser would normally take effect for five seconds. However, before the five seconds ended, at least one of the probes from the taser cartridge lost connection to Council, as indicated by a popping sound and Council's subsequent ability to move normally.

27. Council turned onto his stomach and crawled under the bottom bunk along the back wall of cell 17.

28. Several paper bags, which normally hold clothing and other necessities, were under the bottom bunk. Council began moving the bags around and repositioning himself.

29. Bradley and Shelton ordered Council to come out from under the bunk, but he remained under the bunk, moving bags around.

30. Bradley fired another cartridge from his taser at Council, but Council still remained under the bunk.

31. Shelton, standing approximately five feet from Council, fired a beanbag from his shotgun so that it would ricochet off the floor and hit Council. The beanbag hit the floor, hopped slightly, and slid into Council.

32. Officers trained with beanbag rounds are taught that it is unsafe to fire beanbags directly at the target if less than twenty feet from the target and to instead fire a ricochet shot.

33. Council crawled out from under the bunk after the beanbag hit him.

34. Bradley and Shelton handcuffed Council and used no more force against him. The entire incident in cell 17 lasted approximately twenty seconds.

35. Bradley escorted Council out of cellblock 2 towards intake for processing.

Shelton remained in cellblock 2 to continue in the efforts to get all the inmates locked into their cells. Some inmates were still not under control, and Shelton fired another beanbag from approximately twenty feet directly at another inmate who refused to get in his cell.

36. As a result of the force applied by Bradley and Shelton, Council suffered bruising to his right hip, a puncture wound from a taser probe in his torso, and a puncture-and-tear wound from a taser probe to the back of his left hand. As a result of his own movements in crawling on the floor of cell 17, Council suffered scrapes to his forearms and the left side of his torso. A doctor diagnosed his injuries as minor, and Council did not require medical treatment.

## II. CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

3. Whether a jailer's use of force is excessive depends on whether the jailer's act "shocks the conscience." *E.g.*, *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008), *overruling on other grounds recognized by Randall v. Scott*, No. 09-12862, 2010 WL 2595585 (11th Cir. June 30, 2010).

4. The use of force will necessarily shock the conscience if it was applied malicious and sadistically for the purpose of causing harm. *E.g.*, *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *Danley*, 540 F.3d at 1307; *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002); *see Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178 (2010).

5. The Court looks to the following factors to evaluate whether actions shock the conscience: (a) the need for force; (b) the relationship between that need and the amount of force used; (c) the extent of the resulting injury; (d) the extent of the threat, as reasonably perceived by the responsible officials on the basis of facts known to them; and (e) any efforts made to temper the severity of a forceful response. *E.g.*, *Whitley*, 475 U.S. at 321; *Danley*, 540 F.3d at 1307; *Skrtich*, 280 F.3d at 1300.

6. Force is deemed legitimate in a custodial setting as long as it is applied in a good faith effort to maintain or restore discipline. *Whitley*, 475 U.S. at 320; *Skrtich*, 280 F.3d at 1300; *see Wilkins*, 130 S. Ct. at 1178.

7. Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding. *Danley*, 540 F.3d at 1307.

8. Prison guards are afforded deference for actions taking in response to confrontations with riotous inmates and preventative measures intended to reduce the incidence of breaches of prison discipline, and the Court will not substitute its judgment for that of prison guards who have made a considered choice. *See Whitley*, 475 U.S. at 322.

9. Law enforcement may not use force against a prisoner who has already been subdued, as force would no longer be necessary to maintain or restore discipline. *See Skrtich*, 280 F.3d at 1304.

10. Pyatt committed a criminal act when he threw a liquid on Deputy Stokes as she escorted Snell out of cellblock 2. *See, e.g.*, Ala. Code §§ 13A-6-21, 13A-6-22, & 13A-6-24. As a result, the Deputies rightfully entered cell 17 to take Pyatt into custody.

11. Bradley did not employ excessive force when he first fired his taser at Council. Council's behavior at the time presented a threat to Bradley and Shelton: Council, during an ongoing prison riot, remained behind the "curtain" in cell 17 and would not get down as the officers ordered. Bradley did not use more force than necessary, as he only fired his taser once at this point. Council suffered minor injuries to his left hand and torso from the taser probes.

12. Bradley did not employ excessive force when he fired his taser at Council for the second time. He had reason to believe that the initial shot was no longer having an effect on Council: he heard a popping sound indicating that at least one of the probes had lost contact, and Council was able to move normally as he crawled underneath the bunk. Council continued to present a threat as he crawled under the bunk and began rearranging bags. Given that this occurred during an ongoing prison riot in a notorious cellblock where a weapon had recently been found, Bradley and Shelton had reason both to get Council under control quickly and to fear that he might be searching for a weapon underneath the bunk. The evidence indicates that Bradley only fired his taser once at Council when Council was under the bunk.

13. Shelton did not employ excessive force when he fired a beanbag against the cell floor with the purpose of having it ricochet into Council. Council continued to represent a threat. The prison riot was ongoing, and Council remained under the bunk moving around bags after being tased the second time by Bradley. Shelton only fired one beanbag, after which Council crawled out from under the bunk. Shelton fired the beanbag in accordance

with safety standards and with his training by firing a ricochet shot at a range of less than twenty feet. Council suffered minor injuries to his right hip from the beanbag.

14. The two shots fired from the taser by Bradley and the one beanbag fired from the shotgun by Shelton represent all of the force used against Council, none of which constitutes excessive force.

15. The credible evidence does not support a conclusion that any defendant violated Council's rights under the United States Constitution.

### III.  CONCLUSION

The Court finds that judgment is due to be entered in favor of Defendants and against Plaintiff. The Court will enter a separate final judgment in favor of Defendants consistent with this Memorandum Opinion and Order.

Furthermore, the Court reserved ruling on the defendants' motion for summary judgment on the issue of the plaintiff's alleged failure to exhaust his administrative remedies. (Doc. #12). After considering the arguments and evidence, it is hereby ORDERED that the motion is DENIED.

DONE this the 25th day of August, 2010.

                                              /s/ Mark E. Fuller
                                            CHIEF UNITED STATES DISTRICT JUDGE